UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| COMPETITIVE TECHNOLOGIES, INC., | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 3:07cv1327 (PCD) |
| | : | |
| BENJAMIN MARCOVITCH, ET AL., | : | |
| Defendants. | : | |

## RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff Competitive Technologies, Inc. ("Plaintiff" or "CTT") has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56, claiming that "the Defendants, individually and in concert, made numerous false representations that induced CTT to transfer $750,000.00, which Defendants thereafter unlawfully kept." (Memo. in Supp. of Mot. for Summ. Judgment at 1)  Defendants in this action are Benjamin Marcovitch ("Marcovitch"), Betty Rios Valencia ("Rios Valencia"), John Derek Elwin, III ("Elwin"), Agrofrut, E.U. ("Agrofrut"), and Sheldon Strauss ("Strauss").  Plaintiff's amended complaint asserts claims against various Defendants for Violation of Section 10(B) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10B-5 Promulgated Thereunder (Count One), Conversion (Count Two), Fraud in the Inducement/Misrepresentation (Count Three), Conspiracy (Count Four), Unjust Enrichment (Count Five), Breach of Contract (Count Six), Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Seven), Breach of Fiduciary Duty (Count Eight), Aiding and Abetting Breach of Fiduciary Duty (Count Nine), Conspiracy to Breach Fiduciary Duty (Count Ten), Violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count Eleven), Violation of Conn. Gen. Stat. § 52-564 (Count Thirteen), Violation of Section 14(a) of the Exchange Act and Rule 14(a) Promulgated Thereunder (Count Fourteen), and seeks a declaration that

Defendant Marcovitch is no longer a CTT Board member (Count Twelve).  For the reasons stated herein, Plaintiff's Motion for Summary Judgment [Doc. No. 98] is **denied.**

## I.     STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d, 265 (1986).  If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  In determining whether the parties have met their respective burdens, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted).  However, the

non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)); see also FED. R. CIV. P. 56(e).

Determinations of the proper weight to accord evidence and assessments of the credibility of witnesses are within the sole province of the jury and are therefore improper on a motion for summary judgment. Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

## II. DISCUSSION

Plaintiff's statement of the facts, as derived from Plaintiff's Memorandum in Support of the Motion for Summary Judgment except as otherwise noted, is as follows:

John Nano ("Nano") is currently the President, Chief Executive Officer ("CEO"), and Chairman of the Board of Plaintiff CTT. (Nano Affidavit ¶ 2)  CTT is a Delaware corporation with a principal place of business in Connecticut, which describes itself as a "full service technology transfer and licensing provider" and "a global leader in identifying, developing, and commercializing innovative technologies in life, electronic, nano and physical sciences." (Am.

3

Compl. ¶ 1)  On November 6, 2006, Marcovitch contacted Nano to request that Nano meet with him and his business associate Elwin to discuss a proxy contest.  The meeting took place in Florida on November 9 and 10, 2006, at which point, after discussing the proxy contest, Marcovitch allegedly told Nano about Agrofrut, a Colombian company of which Marcovitch claimed to be a principal along with his wife Rios Valencia.  Marcovitch told Nano that Agrofrut had "a proprietary interest in a revolutionary new nutraceutical micro-separation technology that...could, in a cost efficient manner, separate extremely pure compounds (such as bromelain and xylitol) from pineapple waste... [and] produce 60 gallons of ethanol from each ton of pineapple waste."  (Memo. in Supp. of Mot. for Summ. Judgment at 2)

On February 2, 2007, Marcovitch was elected to CTT's Board of Directors, and Elwin was made a CTT employee on February 5, 2007.  On February 27, 2007, CTT sent a due diligence request to Rios Valencia at Agrofrut, in response to which, during March 2007, Elwin delivered to CTT various documents that he and Marcovitch said had been obtained from Rios Valencia and Agrofrut.  Plaintiff claims that through these documents and in person, Defendants Marcovitch, Rios Valencia, Elwin, and Agrofrut made numerous false representations to Nano and other CTT board members which induced CTT's Board of Directors to vote on March 28, 2007 to approve a payment of $750,000.00 to Agrofrut, which Plaintiff maintains was to be used solely to purchase, construct and operate a commercial version of the micro-separation device prototype.  Marcovitch did not participate in this vote.  (Am. Compl. ¶ 37)  As an example of the alleged misrepresentations, Plaintiff contends that the documents provided in March 2007 described Dr. Aragon Davalos as the chief scientist and a key manager of Agrofrut, yet Dr. Davalos had actually been dead since February 28, 2007, and that "at no time before CTT

transferred the $750,000.00 to Agrofrut's account on April 18, 2007 did any of the Defendants inform CTT that Dr. Aragon Davalos had been killed." (Memo. in Supp. of Mot. for Summ. Judgment at 6)

On April 17, 2007, CTT and Agrofrut executed a Stock Purchase Agreement and Exclusive Marketing Agreement, under which CTT obtained a five percent ownership stake in Agrofrut and marketing rights for Agrofrut products in exchange for a payment of $750,000.00, which was electronically transferred to Agrofrut's account on April 18, 2007. "Mr. Nano traveled to Cali, Colombia during the week of April 16, 2007 to personally inspect CTT's investment and Defendants' progress" (Memo. in Supp. of Mot. for Summ. Judgment at 9), during which time he was shown land that Agrofrut claimed to be purchasing for the plant. Plaintiff states that this land was in fact restricted to residential use. Furthermore, "[p]er prior conversations with Mr. Marcovitch, Mr. Nano expected to see Agrofrut's technology prototype upon his arrival in Colombia. However, when Mr. Nano arrived in Colombia, he found no revolutionary micro-separation technology as previously described by Defendants. Rather, Mr. Marcovitch told Mr. Nano that Agrofrut's prototype had been disassembled and was in storage." (Am. Compl. ¶ 46) Nano asked to meet other members of Agrofrut's management and was told that they were unavailable. (Am. Compl. ¶ 47) Upon Nano's return to the United States, "Defendants represented to CTT that Agrofrut's prototype had been reassembled and was working perfectly," which Nano "reasonably believed." (Am. Compl. ¶ 49) However, "[b]ecause Defendants had not provided adequate responses to prior due diligence requests, on April 25 and May 30, 2007, CTT sent additional due diligence requests to Agrofrut." (Am.

Compl. ¶ 50)  CTT repeatedly pressed Agrofrut to provide samples of the extracted substances and engineering drawings for the commercial plant, which it never did.  (Am. Compl. ¶¶ 51-52)

At some unspecified date thereafter, "upon learning that the plant was not in operation, CTT contacted Agrofrut and Mr. Marcovitch and requested that Agrofrut immediately return CTT's $750,000.00 payment or place the money in escrow while the independent investigation was pending" (Memo. in Supp. of Mot. for Summ. Judgment at 10), which Defendants refused to do.  To date, no plant has been constructed.  On July 31, 2007, the CTT Board voted to request Marcovitch's resignation as a board member.  (Am. Compl. ¶ 65)  Marcovitch responded on August 7, 2007 disputing CTT's right to remove him under CTT's by-laws, and on August 8, 2007, the CTT Board voted to remove Marcovitch "for cause."  (Am. Compl. ¶¶ 66-67)  Plaintiff further claims that since the removal of Marcovitch, Defendant Strauss, who "either owns or controls shares of CTT stock through accounts in other people's names," has acted with the support of Marcovitch to "mount a campaign to discredit the [CTT] Board and to have CTT's shareholders terminate certain Board members, including Mr. Nano."  (Am. Compl. ¶¶ 71-72)

Plaintiff's statement of the facts raises as many questions as it answers, not least of which is why Plaintiff, a presumably sophisticated corporation which represents itself as "a global leader in identifying, developing, and commercializing innovative technologies in life, electronic, nano and physical sciences" (Am. Compl. ¶ 1), would have been so readily taken in by what it now characterizes as a "scheme to loot the corporate treasury." (Memo. in Supp. of Mot. for Summ. Judgment at 10)  Part of CTT's business is to investigate the feasability and potential of new inventions.  Therefore, one would expect CTT to have well-developed systems for identifying proposals that are not viable or that are less promising than they initially appear, yet

6

they claim to have proceeded largely on faith and in reliance upon unsubstantiated claims by Defendants. It is not clear why CTT proceeded with the transaction based on what its own amended complaint characterizes as inadequate due diligence, as evidenced by the fact that CTT sought additional due diligence after completing the wire transfer of the funds. Nor is it evident why Nano traveled to Colombia only the week that transaction was consummated, and not earlier, to confirm validity of enterprise, or why he didn't cancel or postpone the transaction when he was told that he couldn't meet key managers and couldn't see the prototype, supposedly because it had been disassembled for storage. If, unbeknownst to Plaintiff, Defendants were lying in order to induce Plaintiff to invest, Plaintiff's gullibility would not excuse the fraud, but Plaintiff's apparent failure, as sophisticated party, to take reasonable steps to protect its own interests calls into question somewhat the credibility of its claim that it was simply duped into investing in Defendants' fraudulent Agrofrut scheme.

Defendants offer an alternate interpretation of events, in which the alliance between Marcovitch and Nano was formed primarily to return Nano to his role as the head of CTT. Defendants' version seems to suggest, but does not state, that the Agrofrut transaction represented a kind of *quid pro quo*, regarding which CTT subsequently changed its mind and sought to rescind. Defendants' version of the facts, as derived from Defendants' Opposition to the Motion for Summary Judgment except as otherwise noted, is as follows:

Defendants maintain that Nano had previously been fired by CTT for "allegedly violating the Connecticut Trade Secrets Act, in taking confidential information of the company to his personal benefit and for violation of his fiduciary duties and duties of loyalty to CTT." Id. Defendants refer the court to Nano v. Competitive Technologies, 3:06cv00817 (CFD), which was

filed on May 26, 2006 and resolved through settlement on March 15, 2007. Nano's Complaint in that case alleges that Nano "joined CTT as its President and Chief Executive Officer and a member of the Board of Directors on June 17, 2002" (Compl. ¶ 8) and that he was terminated effective June 14, 2005. (Compl. ¶ 34) Defendants assert that Maxwell Divinsky, a former shareholder of CTT and acquaintance of Marcovitch, asked Marcovitch to meet with Nano to "help [Nano] return to power at CTT." (Opp. to Mot. for Summ. Judgment at 8) The sole purpose and topic of discussion at the November 2006 meeting between Marcovitch and Nano was "how Mr. Marcovitch could help organize and prevail in a proxy fight to help Mr. Nano return to a position of authority at CTT." Id.

After the meeting, Nano and Marcovitch and two others, W.L. Reali and Ralph Torello, entered into a letter agreement concerning their intention to "obtain voting control of the Board of Directors of CTT." (Ex. A to Marcovitch Affidavit) The letter is dated November 14, 2006 but was not executed until January 17, 2007. In January 2007, Marcovitch introduced Rios Valencia to Nano and the topic of Agrofrut was first raised.

While the Stock Purchase Agreement ("SPA") initially provided for CTT to purchase only 5% of Agrofrut, Defendants argue that it also contained a provision under which CTT would eventually come to own all of Agrofrut's shares, in turn making Rios Valencia, as head of Agrofrut, a "substantial shareholder" in CTT. (Opp. to Mot. for Summ. Judgment at 9-10, citing SPA ¶ 4) After the signing of the SPA, Marcovitch began in his capacity as a CTT board member to question some of the expenditures that Nano was making of CTT funds, leading to a souring of the relationship between the two. Marcovitch contends that Nano commenced the investigation about him and Rios Valencia in an attempt to consolidate his power over CTT's

Board, stating that "With Mr. Marcovitch's removal from the Board, Mr. Nano would again dominate the Board.  With the removal of the possibility of Ms. Rios becoming a substantial shareholder, Mr. Nano faced little risk of another proxy fight with a large block of stock being voted by Ms. Rios, which could again result in his ouster." (Opp. to Mot. for Summ. Judgment at 10)

Plaintiff's Amended Complaint does not mention the proxy contest at all in conjunction with its description of the cause for the initial meeting, stating only that Marcovitch asked Nano to meet him to "discuss Agrofrut's business and to discuss a potential relationship between Agrofrut and CTT" (Am. Compl. ¶ 11) and further asserting that "The proposed Agrofrut transaction was the primary reason for electing Mr. Marcovitch as a Board member." (Am. Compl. ¶ 25)  Plaintiff's Memorandum in Support of the Motion for Summary Judgment, by contrast, presents the proxy contest as the primary motivation for the first meeting. (Memo. in Supp. of Mot. for Summary Judgment at 2)  While Nano's affidavit does state that he was "most recently elected to the [CTT] Board in early February 2007" (Nano Affidavit ¶ 2), it does not provide additional context regarding his more complex and longer term relationship with CTT.

In addition to relating the above information, Defendants highlight the following disputed material facts with respect to Plaintiff's statement of facts: Defendants maintain that Agrofrut was not discussed at all at the November 2006 meeting between Nano and Marcovitch. Defendants deny that Elwin delivered due diligence documents about Agrofrut to CTT, or that Elwin ever made representations of any kind with respect to Agrofrut.  Defendants maintain that Nano had been informed of the death of Dr. Davalos prior to sending the $750,000.00 to Agrofrut, in contradiction of his claim that he would not have sent the money had he been aware

9

of the death.  Defendants dispute that the money was designated solely for the construction of a full scale plant, maintaining that their use of the funds was consistent with the terms of the SPA and the understanding between the parties.

Defendants deny Nano's assertion that the land he was shown in Colombia could never have been used to build the plant because it was restricted to residential use.  Defendants note that CTT has submitted no evidence in support of that claim.  Nano's affidavit states that CTT learned this information through an investigation by private investigation firm Breen and Associates, but no investigative report or documentation of the alleged restriction is attached.  (Nano Affidavit ¶ 27)  Defendants have submitted what they purport to be a deed for the land containing no residential restriction and authorizing its "agroindustrial" use.  (Exhibit A to Uribe Affidavit)  Without taking a position on the authenticity of this document or the accuracy of the translation thereof, it is sufficient for purposes of deciding this motion to note that Plaintiff has not offered any proof of its contested claim that there was a residential restriction.

Rios Valencia claims that she owned the intellectual property rights to the micro-separation technology at the time of the Agrofrut transaction, disputing Plaintiff's assertion to the contrary. Plaintiff contends that this statement in Rios Valencia's affidavit contradicts her prior sworn deposition testimony.  If so, Plaintiff may use that deposition testimony to impeach Ms. Rios Valencia's contradictory testimony at trial.  The court does not rely on this issue, or on any other issue with respect to which Plaintiff has contended that there is a contradiction between the depositions and the affidavits, as a basis for denying summary judgment.  There are sufficient disputed issues of material fact to preclude summary judgment even if the court excludes from

consideration issues arguably created only through affidavits that contradict prior deposition testimony.

Another disputed issue is whether Defendants have criminal histories, and if so, whether and when Plaintiff was aware of such when it did business with Defendants.  Plaintiff states that Defendants Marcovitch and Rios Valencia were arrested by federal authorities in December 1994 for operating a company in New York called Privat Capital Inc., which was used to hide approximately $3 million for the Cali drug cartel of Colombia in a money-laundering scheme. (Memo. in Supp. of Mot. for Summ. Judgment at 1-2)  Plaintiff's sole authority for this assertion is a December 17, 1994 New York Times article entitled "Fake Bank Set Up by U.S. Agents Snares Drug-Money Launderers."  Id.  Plaintiff has not attached this article as an exhibit, nor provided any documentation of the alleged arrest or any ensuing prosecution of Defendants. Plaintiff states that "None of these [criminal] activities were known to CTT at the time CTT entered into the transactions with Defendants" (Memo. in Supp. of Mot. for Summ. Judgment at 2), the implication being that Plaintiff would not have done so had it known.

Defendants maintain that "Nano was advised long before the transaction was consummated that Mr. Marcovitch and Ms. Rios had been falsely accused and arrested." (Opp. to Mot. for Summ. Judgment at 2-3)  Defendants contend that Marcovitch and Rios Valencia were "completely exonerated [and] acquitted" and that the presiding Judge had the Clerk of the Court seal the files and issue a certificate showing the disposition of acquittal, although they have notably failed to attach any such document.  (Opp. to Mot. for Summ. Judgment at 3) Defendants point to a June 2007 email from Nano to CTT counsel Stephen Sale, in which Nano

thanks Sale for a letter he sent to Bank of America on behalf of Marcovitch, attesting to Marcovitch's complete exoneration in the 1994 matter. (Ex. D to Marcovitch Affidavit)

The assertion that Plaintiff did not know when entering into the transaction with Agrofrut in April 2007 about Defendants' alleged 1994 arrests appears to be contradicted by Plaintiff's Amended Complaint, which states, "Mr. Marcovitch had previously indicated that the only negative mark on his or Ms. Rios Valencia's name was a 1994 New York indictment for money laundering, which he claimed was later dismissed." (Am. Compl. ¶ 59)  This statement appears in a section of the complaint which discusses information that was newly discovered by CTT as the result of a third-party investigation conducted during the summer of 2007, thus distinguishing the 1994 arrests as previously known information, in contrast with newly discovered information about Rios Valencia's alleged 1983 arrest.

Plaintiff's Amended Complaint asserts that a third party investigation initiated by CTT revealed that "Ms. Rios Valencia had been arrested in the United States for serious drug violations in 1983 and was convicted and sentenced in 1984," and that Defendants "never disclosed this fact to CTT." (Am. Compl. ¶ 59)  These allegations are not repeated in the Plaintiff's memorandum in support of the motion for summary judgment, notwithstanding the inclusion of a section entitled "Defendants' Criminal History," and no documentation regarding such an arrest and conviction of Rios Valencia on drug charges has been provided.

## III.     MOTION TO STRIKE AND MOTION TO SUPPLEMENT THE RECORD

Both Plaintiff's Motion for Summary Judgment and Defendants' Opposition thereto are supported primarily by testimony of the parties, in the form of affidavits.  If Defendants' affidavits and the exhibits attached thereto are considered, there are clearly numerous disputed

issues of material fact, the resolution of which is largely a credibility determination to be made by the fact-finder, not by this court upon motion for summary judgment.

Plaintiff has moved to strike in their entirety all five affidavits filed in support of Defendants' opposition to the motion for summary judgment.  These include affidavits by Defendants Marcovitch, Rios Valencia, and Elwin, as well as affidavits by Maxwell Divinsky and Guillermo Uribe.  Plaintiff seeks this relief in reliance upon the Court's order of June 23, 2008, which granted Plaintiff's motion to compel, stating that "Defendants shall have until July 7, 2008 to provide any supplemental responses to interrogatories and any supplemental document productions, at which time discovery will be closed, and Defendants will be foreclosed from subsequently claiming to have newly discovered documents or newly recalled material information."  [Doc. No. 93]  Defendants failed thereafter to amend their discovery responses. Plaintiff argues that Defendants' opposition to the motion for summary judgment, as supported by the five affidavits, "provides quite specific, and completely new, accounts of the events surrounding Defendants' fraudulent conduct, and purports to attach documents never before produced in this case." [Doc. No. 115-2 at 3]

Plaintiff correctly notes that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  <u>Hayes v. New York City Dept. of Corr.</u>, 84 F.3d 614, 619 (2d Cir.1996).  Plaintiff argues that "by analogy, the Defendants should not be allowed to contradict their prior disclosures and discovery responses in later affidavits." [Doc. No. 115-2 at 2]  However, the cases that Plaintiff cites in support of this proposition relate to instances where affidavits contradict prior deposition testimony, not to contradictions between affidavits

13

and responses to interrogatories, document production requests, or Rule 26(a)(1) initial disclosures (collectively, "discovery disclosures"), as is alleged here.  Plaintiff deposed Defendants Marcovitch and Rios Valencia several months before filing the motion for summary judgment, and those depositions would presumably have provided more comprehensive and definitive information than written disclosures would.  Notably, however, Plaintiff's motion to strike Defendants' affidavits does not raise alleged discrepancies between Defendants' depositions and affidavits, notwithstanding that some are referenced in the memorandum in support of the motion for summary judgment.  To the extent that such discrepancies exist, Plaintiff can use the deposition testimony to impeach any contradictory testimony by Defendants at trial.  Furthermore, while Plaintiff has pointed out some discrepancies between Defendants' discovery disclosures and their affidavits, the discrepancies identified are not significant or extensive enough with respect to Defendants Marcovitch, Rios Valencia, and Elwin to justify striking the affidavits in their entirety.

      The question is closer with respect to the affidavits of Maxwell Divinsky and Guillermo Uribe, because Defendants never made 26(a)(1) initial disclosures identifying them as individuals having relevant knowledge, nor were they identified in response to applicable interrogatories.  Plaintiff rightly perceives this failure as egregious in light of the fact that the court previously granted Plaintiff's motion to compel more complete responses to their interrogatories and document requests [See Doc. No 93], yet Defendants failed to amend their responses.  Defendants argue that Plaintiff cannot claim surprise because Plaintiff was aware of the involvement of Divinsky and Uribe.  Defendants also argue that they were not required to disclose information which is now offered primarily for the purposes of impeaching Plaintiff's

claims about when and whether it was aware of various facts, such as those regarding Defendants' alleged criminal histories. Notwithstanding these protests, however, Defendants essentially conceded the deficiencies in their disclosures when they moved, subsequent to the completion of briefing on the motion for summary judgment, to supplement the record by, among other things, filing an initial disclosure statement listing Divinsky and Guillermo. [See Doc. No. 120] In that motion, Defendants state that they "acknowledge that the discovery phase of this case and their responsiveness have not been the picture of typical/traditional federal practice." [Doc. No. 120, ¶ 14.] This is an understatement.

In any case, the resolution of the motion to strike with respect to Divinsky and Uribe is not dispositive of the motion for summary judgment, because there is sufficient information in the affidavits of Marcovitch, Rios Valencia, and Elwin to defeat summary judgment. Given that there must be a trial either way, it makes sense for the fact-finder to have at its disposal all relevant testimony and documents, including that of Divinsky and Uribe, to the extent it is not properly excluded on other grounds. Defendants have indicated their willingness to "cooperate" in additional discovery [Doc. No. 120 at FN 1], although the court recognizes that this is not a fully adequate substitute for Plaintiff's having the information prior to filing the motion for summary judgment. To the extent that Plaintiff wishes to depose Divinsky and/or Uribe, it should do so by April 22, 2009. Defendants' Rule 26(a)(1) Disclosure [Doc. No. 122-2] is hereby deemed to have been provided to Plaintiff. Furthermore, the affidavits and exhibits filed by Defendants in support of the Opposition to the Motion for Summary Judgment have been reviewed by the court for the purposes of ruling on the motion for summary

judgment.  In all other respects, Defendants' Motion to Supplement the Record [Doc. No. 120] is denied as moot.

Finally, Plaintiff objects, without citing any authority, to the affidavit of Guillermo Uribe on the basis that he "has many times been represented as Defendants' Colombian counsel" and "cannot then become an admissible fact witness." [Doc. No. 115-2 at 3]  Plaintiff is correct that Defendants have repeatedly described Uribe as their Colombian counsel, and his affidavit states that he has been a "legal advisor" to Marcovitch and Rios Valencia since August 2006.  (Uribe Aff. ¶ 2)  However, Uribe has not filed an appearance in this case, and there is no indication that he can or will act as counsel to Defendants at trial, so his affidavit will not be stricken on this basis.

### IV.     CONCLUSION

For the reasons stated herein, Plaintiff's motion for summary judgment [Doc. No. 98] is **denied**.  A trial preparation order shall issue.

SO ORDERED.

Dated at New Haven, Connecticut, April  6 , 2009.

                        /s/
Peter C. Dorsey, U.S.D.J.